[Cite as *State v. Bamonte*, 2022-Ohio-1331.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

      Plaintiff-Appellee,          :
                                                              No. 19AP-875
v.                                             :            (C.P.C. No. 18CR-1347)

Anthony Bamonte,                               :            (REGULAR CALENDAR)

      Defendant-Appellant.         :

D E C I S I O N

Rendered on April 21, 2022

**On brief:** *Dave Yost,* Attorney General, *Benjamin W. Karrasch*, *Steven T. Darnell*, *Kristin Pe*, and *Megan E. Grant-Lee*, for appellee. **Argued:** *Steven T. Darnell.*

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow.*

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} A jury found defendant-appellant, Anthony Bamonte, guilty of grand theft under R.C. 2913.02(A)(3) and Medicaid fraud under R.C. 2913.40(B) in the Franklin County Court of Common Pleas. His appeal challenges the legal sufficiency of the state's evidence and its manifest weight, but as discussed below, we find no merit to either argument and affirm the findings of guilt. However, our review of the record shows that the trial court committed plain error by failing to merge the convictions as allied offenses of similar import under R.C. 2941.25. Accordingly, we affirm in part, reverse in part, and remand for resentencing.

**I.  Factual and Procedural History**

{¶ 2} On March 20, 2018, plaintiff-appellee State of Ohio filed a two-count indictment against Mr. Bamonte. Count 1 alleged that between March 19, 2011 and

September 9, 2015, he committed grand theft as defined in R.C. 2913.02(A)(3) by obtaining Ohio Department of Medicaid ("ODM") funds by deception, in an amount over $5,000 but less than $100,000. Count 2 alleged that from March 14, 2011 to September 9, 2015, he committed Medicaid fraud under R.C. 2913.40(B) by using false or misleading statements or representations to obtain reimbursement, in an amount over $5,000 but less than $100,000. Before trial, the state amended both counts to allege that the amounts Mr. Bamonte stole were in excess of $7,500 and less than $150,000. The state also amended Count 2 to allege that Mr. Bamonte committed the fraud between October 1, 2011 and September 9, 2015. (Aug. 26, 2019 Tr. at 5.)

{¶ 3}   A seven-day trial commenced on August 26, 2019. The state's case alleged that Mr. Bamonte defrauded ODM by filing unauthorized claims on behalf of Medicaid recipients for durable medical equipment ("DME") and medical supplies, based on recipients' information obtained from home health care agencies with which his company, ADB Medical Supplies, had done business. The state supported its allegations with testimony from ODM investigators, Medicaid recipients, and owners and employees of home health care agencies.

{¶ 4}   Don Sabol testified about his work at ODM's Bureau of Health Plan Policy as the Medicaid health system administrator, where he oversaw the rules governing DME claims. *Id.* at 398-99. He explained that the Ohio Administrative Code defines DME, which is covered by Medicaid, as "equipment that can stand repeated use, is primarily and customarily used to serve a medical purpose, is not useful to a person in the absence or illness or injury, and is appropriate for use in the home." *Id.* at 404. In contrast, "[s]upplies are basic consumables or disposable things not designed for repeated use." *Id.* at 399. Mr. Sabol explained that under the Medicaid reimbursement rules, "when Medicaid pays for a physician visit or a home health visit, certain items are considered to be necessary for the provision of that service," including supplies such as gloves. *Id.* at 406. Such items are "included in [the] reimbursement" for the service and not subject to a separate reimbursement. *Id.* In other words, "Medicaid will not pay for something that's already included in a payment for a professional service." *Id.* at 407.

{¶ 5}   The rule applies as well to home health services, Mr. Sabol explained. Thus, "supplies for services included in payments to home health companies for home health

services [are] built into the rate" and are "the cost of doing business" for those providers. *Id.* at 408. According to Mr. Sabol, a DME or medical supply company should not bill Medicaid using a recipient's number for gloves it furnishes because "[t]he recipient is not receiving the actual supply item." *Id.* at 408-09. Rather, the supply company should be sending the bill to "[t]he home health agency" that uses the gloves. *Id.* at 409. As an example of when Medicaid would pay for gloves, Mr. Sabol explained that "[t]he patient and prescriber would have to initiate the process for the order" and that gloves would only be justified in the case of "[c]ertain conditions," including post-surgical wound care. *Id.* However, he emphasized that it would never be appropriate for a DME company to bill Medicaid for gloves used by a home health agency. *Id.* at 410. Mr. Sabol also explained that in order for a company to obtain Medicaid reimbursement for DME, the regulations require it to have conforming paperwork that includes a signed and dated "legible prescription from an eligible prescriber" based on a "face-to-face examination," a patient file or "a form or certificate of medical necessity," and "proof of delivery" of the equipment. *Id.* at 412. He testified that ODM should not pay for medical supplies without meeting such requirements or for supplies that a patient did not receive. *Id.* at 413-14.

{¶ 6} Patrick Tighe, the bureau chief of Claims Operations at ODM, testified about the agency's Medicaid claims process. *Id.* at 849-50. He authenticated the "remittance advices" the agency generated showing payments made to ADB Medical Supplies for Medicaid claims. *Id.* at 854. He also explained that ODM does not have "any independent way" of verifying the information in a provider's claim, such as whether a doctor's order exists to support it, and must rely on the truthfulness of the provider to "know what to pay and what to process." *Id.* at 865. ODM processes "a little over a million claims a week." *Id.* at 866.

{¶ 7} Rachel Jones, the Section Chief of ODM's Surveillance and Utilization Review Section, testified about the agency's fraud investigation that resulted in a referral to the Ohio Attorney General. *Id.* at 210. She explained that ODM sent out explanation of medical benefits ("EOMB") letters "on a monthly basis asking [Medicaid] recipients to verify the services that were paid in the previous month on their behalf." *Id.* at 211. Ms. Jones explained that if a Medicaid recipient has not received the services listed on the EOMB, the recipient is asked "to indicate that on the letter" and return it in an enclosed envelope. *Id.*

at 213. Based on EOMB letter responses received from Medicaid recipients, ODM referred ADB Medical Supplies to the Ohio Attorney General. *Id.* The referral occurred after a claims review process in which Ms. Jones and her staff noticed "[v]ery strange billing patterns" by ADB Medical Supplies, including "billing for a year's worth of services in one claim" or for services performed a year before the billing date. *Id.* at 214-15. Her staff also "reached out" to the Medicaid recipients who had responded to confirm that "they had not received the services" in question. *Id.* at 216. Ms. Jones stated that her office only referred potential fraud cases to the Ohio Attorney General when the EOMB letter recipient's response "clearly states they did not receive the supplies and they know nothing about the supplies." *Id.* at 260.

{¶ 8} Mike McCabe also testified about the work of ODM's Surveillance and Utilization Review Section, where he monitored the EOMB letter program. *Id.* at 368-69. His investigation started when he "received two letters on consecutive days from two different people claiming that they had not received the products that ADB had billed for and were paid [for]." *Id.* at 369. After receiving the letters, Mr. McCabe reviewed ADB Medical Supplies' claims and "notice[d] the same billing pattern on some other recipients." *Id.* at 372. He also reviewed the company's reimbursement history, "looking for dramatic jumps that may indicate something." *Id.* According to Mr. McCabe, ADB Medical Supplies was reimbursed "approximately $84,000 from Medicaid" in 2012, but within "the first 25 or 24 weeks of 2013, they had already received $238,000 of reimbursement in less than six months, almost a 300 percent increase, which is pretty dramatic." *Id.* He then noticed that in March 2013 alone, the company received $128,000. *Id.* at 373. Mr. McCabe sent out targeted EOMB letters to Medicaid recipients about ADB Medical Supplies' claims and received 51 responses, which he sent directly to the special agent at the Ohio Attorney General conducting the investigation. *Id.* at 373-74.

{¶ 9} A number of Medicaid recipients, their caregivers, and relatives testified about billing discrepancies that prompted them to notify ODM via EOMB letters. R.A. testified that her son was a Medicaid recipient whose condition required him to have a home health aide. *Id.* at 114. R.A. never asked for medical gloves for her son's care, stated that no gloves were ever shipped to their home, and testified that the aide caring for her son had no need to wear gloves while providing care for him. *Id.* at 115-16. R.A. identified

several EOMB forms that she had received that asked her to "check no" by any items listed that she had not received. *Id.* at 116-19. She confirmed that she checked no listings on the forms for gloves billed by ADB Medical Supplies. *Id.* at 119. R.A. testified that before receiving the forms, she did not know that anyone was billing Medicaid for gloves for her son. *Id.* at 121.

{¶ 10} G.B. testified that she was the home health aide for her sister, a Medicaid recipient. *Id.* at 132-33. She stated that she had never ordered gloves from ADB Medical Supplies. *Id.* at 135. According to G.B., she sometimes used gloves when taking care of her sister, but always bought them herself at Walgreens or Walmart. *Id.* at 136. She also testified that gloves and adult diapers were never shipped directly to her home. *Id.* at 160-61.

{¶ 11} A.R., a Medicaid recipient, testified that she received home health services from her daughter in 2013 and 2014, and that her daughter did not wear or use gloves when assisting A.R. *Id.* at 165-66, 168. A.R. did not request or receive gloves during those years, and she had never heard of ADB Medical Supplies. *Id.* at 166-67.

{¶ 12} F.I. testified that her daughter received in-home nursing and home health aid services. *Id.* at 178-79. In 2013 and 2014, only the nurses used gloves while taking care of her daughter. *Id.* at 179. The nurses provided services about twice a week during that time. *Id.* F.I. stated that she received a box of gloves that she didn't order. *Id.* at 180. She received a letter from ODM and filled out a response stating that she had never ordered gloves. *Id.* at 181-84.

{¶ 13} J.Y. testified that her daughter was a Medicaid recipient who received home health care services through Complete Home Healthcare. *Id.* at 272. She stated that she had never heard of ADB Medical Supplies and had never received a delivery of "a year's supply of gloves at once" in 2012 or 2013. *Id.* at 272-73.

{¶ 14} P.J. testified that her son was a Medicaid recipient who received home health services. *Id.* at 314-15. Her son's care did not require medical gloves. *Id.* at 316. P.J. had no knowledge of ADB Medical Supplies and had never received a shipment of gloves at her home. *Id.*

{¶ 15} J.S. testified that she received an EOMB from ODM concerning supplies for her daughter, a Medicaid recipient. *Id.* at 330, 335. She "check[ed] no" on the EOMB

response form because her daughter had "never received [the] supplies" listed. *Id*. at 334. According to J.S., her daughter did not require medical gloves and J.S. had never received any shipments of gloves in 2013 and 2014. *Id*. at 329-30. J.S. had no knowledge of ADB Medical Supplies. *Id*. at 334.

{¶ 16} L.G. testified that she was her mother's home health aide in 2013 and 2014. *Id*. at 352. During that time, her mother also received in-home nursing care. *Id*. at 353. Neither L.G. nor the nurses ever wore gloves when caring for her mother. *Id*. at 353-54. L.G. testified that two boxes of medical supplies were delivered to her home that she had not ordered. *Id*. at 355. Other than that shipment, she never received any deliveries of medical supplies. *Id*. at 355-56.

{¶ 17} L.H. testified that her son was a Medicaid recipient and that she was his home health aide. *Id*. at 500-02. She originally did her home health aide billing through International Quality Healthcare. *Id*. at 502. L.H. used gloves when caring for her son but always bought them herself. *Id*. She testified that from August 2013 to May 2014, she did not receive any deliveries of gloves, and, more specifically, did not receive four boxes of monthly deliveries of gloves to her home or a total of 40 boxes of gloves. *Id*. at 503-04. L.H. also testified that she never ordered any medical supplies through ADB Medical Supplies. *Id*. at 504.

{¶ 18} The state also called witnesses from several of the home health agencies that had contractual arrangements with ADB Medical Supplies. A.O. testified as the 100 percent owner of International Quality Healthcare, a home health care services company. *Id*. at 436-37. Her company supplied its employees with gloves and other supplies as necessities for "do[ing] their work well" and did not bill Medicaid for supplies. *Id*. at 441. She testified that her company became involved with ADB Medical Supplies in 2014 during a period that Medicaid was switching to a managed care system and billing for home health services was difficult. *Id*. at 442.

{¶ 19} A.O. testified that that she spoke directly with Mr. Bamonte, who promised her help with getting reimbursement from the managed care companies. *Id*. at 444-45. She agreed because her company was having problems with billing to the extent that payroll was not being met. *Id*. at 445. After asking for references, A.O. provided ADB Medical Supplies with her clients' information in order to bill on her company's behalf. *Id*. at 446.

Her company had an excess of medical supply inventory because it had previously been a DME provider. *Id.* at 447. Through Mr. Bamonte, A.O. entered into an agreement with ADB Medical Supplies in which that company would be "the ones buying [International Quality Healthcare] inventory and supplying it, and then they would bill it since they [had] the billing capability." *Id.* at 448. She received two checks from ADB Medical Supplies in September 2014 for over $32,000 of medical supplies. *Id.* at 450-51. In 2015 or 2016, A.O. was contacted by the Ohio Attorney General, and realized then that ADB Medical Supplies had billed her clients for more than the home health services they originally helped her with in June, July, and August 2014. *Id.* at 453-54.

{¶ 20} B.J., a former employee of International Quality Healthcare, testified that he worked on the company's "bookkeeping and HR and payroll and taxes." *Id.* at 519. He testified that ADB Medical Supplies personnel came into the office "to help recover some back claims" for home health services from managed care insurers that had not been paid to International Quality Healthcare. *Id.* at 520, 529. The ADB Medical Supplies employees "had total access to [the] electronic patient records" of International Quality Healthcare clients. *Id.* at 521.

{¶ 21} B.J. described an overheard conversation in which an ADB Medical Supplies employee told an insurer "that one client was eligible for certain [DME] * * * every three months," which made him "uncomfortable" because "just because they're eligible, doesn't necessarily mean that they need [the DME]." *Id.* at 522. After the arrangement with ADB Medical Supplies ended, International Quality Healthcare "started getting complaints, calls that were complaining about equipment, bills for equipment that [clients] claimed they did not receive." *Id.* B.J. told clients that the bill was not from International Quality Healthcare and "if it was something that they did not get, that they should report that to the State." *Id.* While B.J. worked for International Quality Healthcare, he ordered gloves for International Quality Healthcare aides "from a company called First Choice in Mississippi." *Id.* at 525. International Quality Healthcare paid for the gloves itself, not Medicaid. *Id.*

{¶ 22} G.T. testified about her employment at Cincinnati Home Care, starting in 2012, where she was responsible for billing "Medicare, Medicaid, [and] any of the private insur[ers]." *Id.* at 531. While working at Cincinnati Home Care, ADB Medical Supplies contacted her and offered to supply gloves to Cincinnati Home Care clients, Medicaid

recipients, and "be reimbursed" for them. *Id.* at 532-33. G.T. passed the offer onto the owner of Cincinnati Home Care, which in the past "had always supplied those gloves to [its] aides." *Id.* at 533. After the owner agreed, ADB Medical Supplies requested "client information" from G.T., which she provided. *Id.* at 533-34. According to G.T., the relationship between the two companies was "short-lived." *Id.* at 535. Cincinnati Home Care received "between 20 and 30 cases of gloves" from ADB Medical Supplies. *Id.* G.T. began to receive calls from "clients that were angry that they were being bothered" by ADB Medical Supplies and she told the company to stop calling clients. *Id.* at 536.

{¶ 23} G.T. stated that it was her understanding that providing gloves to "staff members that are going out into the homes" was a "cost of doing business" of a home health agency. *Id.* at 536-37. She stated that she never agreed "to let ADB Medical Supplies bill for over $13,000 worth of blood pressure monitors, heating pads, or underpads" to clients of Cincinnati Home Care. *Id.* at 537.

{¶ 24} L.S., a former employee at Cincinnati Home Care, testified that the company was approached by an ADB Medical Supplies representative who claimed "that there was a new rule that had [come] out in which Medicaid clients could receive gloves and that the home care agencies no longer had to supply them." *Id.* at 550-52. L.S. believed that what the representative claimed "was too good to be true." *Id.* at 552. In exchange for Cincinnati Home Care's "patient information list," ADB Medical Supplies offered to provide two boxes of gloves a month. *Id.* at 552-53. Before this interaction, L.S. believed that "it was a cost of doing business for an agency to provide gloves." *Id.* at 553. L.S. testified that Cincinnati Home Care began to receive complaints from patients and their families after ADB Medical Supplies contacted them, so she told its representative "to cease and desist." *Id.* at 554-55.

{¶ 25} M.M., Cincinnati Home Care's office manager, testified that "[t]he company would order the gloves, and then we would just disburse them to the home health aides" before its involvement with ADB Medical Supplies. *Id.* at 566-67. After Cincinnati Home Care entered into its arrangement with ADB Medical Supplies to supply gloves, M.M. was tasked with contacting clients and aides to "let them know that we would no longer be supplying gloves for them." *Id.* at 568. A short time later, clients began to complain that they were not receiving gloves and Cincinnati Home Care began ordering gloves itself again.

*Id.* According to M.M., none of its clients required the use of reusable protective underpads or automatic blood pressure cuffs. *Id.* at 568-69.

{¶ 26} T.W., a nurse working for Total Homecare Solutions, testified that his responsibilities included taking medical supplies to clients' homes. *Id.* at 600-01. He received a "cold call" from someone at ADB Medical Supplies in early 2013 claiming that Total Homecare Solutions was "entitled to gloves" and could "back date and bill for two years prior" to obtain reimbursement for them. *Id.* at 602. T.W. stated that ADB Medical Supplies wanted the "names of our clients, date of births, [and] Medicaid numbers" and after obtaining approval from his boss, he supplied the information. *Id.* at 603-04. Before the arrangement with ADB Medical Supplies, T.W. ordered gloves from a pharmacy supplier for Total Homecare Solutions. *Id.* at 605. During the three months that Total Homecare Solutions did business with ADB Medical Supplies, the company never agreed to allow ADB Medical Supplies to bill for diapers or underpads for its patients. *Id.* at 608.

{¶ 27} N.A., the owner of Total Homecare Solutions, testified that the company provides in-home support to persons with developmental disabilities. *Id.* at 625-26. The company first interacted with ADB Medical Supplies in March 2013. *Id.* at 627. According to N.A., ADB Medical Supplies presented "an opportunity to be reimbursed for [medical] gloves, something that we typically had to pay for ourselves." *Id.* at 628. N.A. could not recall if the arrangement with ADB Medical supplies also covered reimbursement for previously obtained supplies. *Id.* He acknowledged receiving two reimbursement checks from ADB Medical supplies totaling a little over $5,300 for gloves provided in 2013. *Id.* at 628-30. After its relationship with ADB Medical Supplies ended, Total Homecare Solutions went back to paying for gloves itself. *Id.* at 631. N.A. stated that his company never authorized ADB Medical Supplies to bill over $11,000 for diapers and underpads. *Id.* at 632. According to N.A., Total Homecare Solutions would pay for any such items itself if a client needed them but were not prescribed by a doctor. *Id.*

{¶ 28} T.S. was the office administrator for Classic Healthcare Services. *Id.* at 643. Shortly after she started working there in October 2014, ADB Medical Supplies "came in to help with some HMO billing" and also offered to "order gloves for us." *Id.* at 644-45. T.S. explained that the typical process for obtaining medical supplies was that "we order it from the DME company and the DME bills the insurance" for the supplies. *Id.* at 645. At Classic

Healthcare Services, the owner ordered gloves and paid for them. *Id.* T.S. recalled two deliveries of "about three boxes" of gloves from ADB Medical Supplies. *Id.* at 647-48. After clients began to complain, Classic Healthcare Services stopped working with ADB Medical Supplies. *Id.* The complaints also led to Classic Healthcare Services receiving a "write-up" from a firm overseeing Medicaid complaints and the company had to attest that it was "no longer doing business with" ADB Medical Supplies and was doing its own ordering. *Id.* at 647. T.S. also worked as a home health aide for Classic Healthcare Services and when asked about three specific clients, confirmed that aides would either have had no or minimal use for gloves for them. *Id.* at 649-50.

{¶ 29} F.B., the CEO and owner of Classic Healthcare Services, also testified. *Id.* at 660. She stated that her company became involved with ADB Medical Supplies at the end of 2014 to help with billing managed care organizations after the introduction of preauthorizations. *Id.* at 661. After working on the billing issues, representatives from ADB Medical Supplies asked F.B. why she was ordering and paying for gloves herself when her company could be billing Medicaid for them. *Id.* at 663. ADB Medical Supplies began ordering gloves for Classic Healthcare Services' patients, which were delivered to the company's office. *Id.* at 663-64. Clients "started calling" and complaining that Classic Healthcare Services was "billing a lot of things for them" and threatened to report the company for billing unnecessary supplies. *Id.* at 664-65. F.B. then terminated her company's relationship with ADB Medical Supplies. *Id.* at 665. She testified that she never asked ADB Medical Supplies to bill for gloves her company provided in 2013 and she never received a reimbursement check from the company. *Id.* at 666.

{¶ 30} V.U., the owner of Quality Care, Cincinnati Home Care, and Comfort and Care Home Health agencies, also testified. *Id.* at 798. She stated that each of her agencies orders and pays for the gloves given to employees to use when caring for patients. *Id.* at 799. The agencies do not supply any medical equipment to patients. *Id.* V.U. recalled receiving a call from ADB Medical Supplies offering to "bill and have Medicaid pay for the gloves," claiming that her agencies did not have to pay for gloves. *Id.* at 800. ADB Medical Supplies representatives met with V.U. and told her that because "you have a year to bill Medicaid," the company "would go back and bill all the gloves that we had supplied

previously, and then would bring us a check when the money [came] in." *Id.* at 801. V.U. agreed and had an employee, G.T., work with ADB Medical Supplies on "logistics." *Id.*

{¶ 31} V.U. identified two cashier's checks from ADB Medical Supply to her agencies, one for $1,250.00 and another for $6,517.05, that were "reimbursement from the State" for "back billing" for gloves. *Id.* at 802-03. V.U. testified that her companies' relationship with ADB Medical Supplies "ended when we started getting numerous calls from our patients telling us that they were getting supplies like blood pressure [monitors], diapers," and ADB Medical Supplies was told "to stop seeing our patients. We also told the patients not to deal with them." *Id.* at 804. V.U. confirmed that she never authorized ADB Medical Supplies "to bill close to $18,000 worth of billings for blood pressure monitors, reusable protective underpads or diapers" on her companies' behalf. *Id.* at 805.

{¶ 32} A number of former ADB Medical Supplies employees also testified. D.S. did clerical work for ADB Medical Supplies in 2014 and 2015. *Id.* at 877. She testified that Mr. Bamonte "would ultimately make decisions when something needed to be done," was there "[r]egularly," and agreed with the characterization that "the buck stopped with him." *Id.* at 879. She accompanied other ADB Medical Supplies employees on visits to home health agencies and confirmed that the agencies gave them "access to patient charts." *Id.* at 880.

{¶ 33} D.W. worked for ADB Medical Supplies in 2013 and stated that Mr. Bamonte and his sister Gina ran the company. *Id.* at 885. Five Bamonte siblings worked there, but D.W. described Mr. Bamonte as "the owner." *Id.* at 886-87. According to D.W., she would "get told" what to bill ODM by Mr. Bamonte or Gina. *Id.* at 888. "They told me what supplies were provided, and I would bill them." *Id.* at 889. D.W. "printed out a paper every week of what was billed -- the patient's names, the supplies, and amounts." *Id.* D.W. testified that she never billed for something without being told what to bill. *Id.*

{¶ 34} R.S. worked for ADB Medical Supplies from January 2014 until February 2015. *Id.* at 909. His work required him "to take calls," "send orders," and "process returns." *Id.* at 910. R.S. testified that Mr. Bamonte "owned the company" and "was also in charge of the company." *Id.* at 911. Mr. Bamonte and Gina "made [it] very clear" to R.S. that no supplies could be sent before billing occurred. *Id.* at 917. ADB Medical Supplies "would bill first, and if everything cleared, then we could dispense the supplies." *Id.* at 916.

R.S. testified that Mr. Bamonte taught him the "pitch" used on cold calls to get clients from home health agencies, which was that ADB Medical Supplies "could get all of your clients free gloves, you know. The State covers it, so they're entitled to them under some universal precautions." *Id*. at 932. R.S. also accompanied Mr. Bamonte and Gina on meetings with home health agencies but "really didn't understand what was going on, for the most part, as far as what they were trying to accomplish." *Id*. at 933.

**{¶ 35}** Gregory Mounts is a special agent supervisor in the Health Care Fraud Section of the Ohio Attorney General's Office. *Id*. at 956. He interviewed Mr. Bamonte on January 8, 2015. *Id*. at 958. During the interview, Mr. Bamonte told Special Agent Mounts that he was the "100 percent" owner of ADB Medical Supplies and "basically ran the company," although his siblings also worked there. *Id*. at 958-59. Mr. Bamonte also told Special Agent Mounts that he was "the only one who had access" to the company's business banking account. *Id*. at 960. Mr. Bamonte disagreed with Special Agent Mounts that the cost of gloves was a home health agency's cost of doing business: "He said it was not the cost of doing business. He said that patients had that reimbursable right, I believe were his words." *Id*. at 964.

**{¶ 36}** When confronted with EOMBs where Medicaid recipients indicated that they had not received supplies, Mr. Bamonte responded that "the population they were dealing with were schizophrenic and mentally retarded, and that the * * * parents of the consumers were confused themselves. So they might not be aware that they were ordering that and/or receiving those supplies." *Id*. at 964-65. Mr. Bamonte's explanation for billing a year's worth of supplies in one month was "if a home health aide for an agency used gloves for an entire year, what they would do is they would go in and get that patient's information and then back bill that for the entire year. And he described it as restocking." *Id*. at 965. When asked about providing reimbursement checks to home health agencies, Mr. Bamonte "said you were not allowed to do that." *Id*. at 965-66.

**{¶ 37}** Wayne Morgan testified as the supervisor of the provider compliance area of the Provider Network Management Bureau at ODM. *Id*. at 987. In that position, he "oversee[s] a team of individuals that make sure that providers are eligible when they initially apply, and that they stay eligible to be providers, and that they follow the rules and regulations related to the Ohio Medicaid program." *Id*. at 987-88. Mr. Morgan

authenticated an ODM provider application signed by Mr. Bamonte on behalf of ADB Medical Supplies that required that the applicant "submit claims only for services that are actually performed." *Id.* at 988-90.

{¶ 38} After ODM suspended ADB Medical Supplies "due to credible allegations of fraud," Mr. Morgan testified that Mr. Bamonte called him "to know why his company was suspended and what he could do to become unsuspended, and what was the process to appeal the decision of the Department." *Id.* at 991-92. Mr. Morgan told Mr. Bamonte that he could "request a reconsideration" from ODM's director. *Id.* In the letter requesting reconsideration, Mr. Bamonte stated that ADB Medical Supplies, acting on behalf of home health care companies, "purchased the gloves and billed Medicaid. The gloves were sent either to the patients directly or to the home health care company itself, if requested by the company." *Id.* at 994. The letter also stated: "For the patients that had already received gloves, having been purchased by the home health companies, ADB filed the necessary paperwork with Medicaid to receive reimbursement for the home health care companies as they are entitled unto under the law." *Id.* at 994-95. However, according to Mr. Morgan, there is no ODM form "that providers can fill out in order to try to get reimbursement to home health agencies for gloves," as home health agencies are not entitled to the reimbursement for gloves described by Mr. Bamonte. *Id.* at 995. The ODM director denied Mr. Bamonte's request for reconsideration of his company's suspension. *Id.*

{¶ 39} Melanie Angle testified about her work on the investigation as a special agent in the Medicaid Fraud Control Unit at the Ohio Attorney General. *Id.* at 1004-05. Special Agent Angle testified about a "voluntary" meeting with Mr. Bamonte in May of 2019 during which he stated that he owned ADB Medical Supplies. *Id.* at 1006-07. When Mr. Bamonte was "asked directly if he provided all the supplies the State was alleging were not provided," he replied that "he did either order or provide all of the supplies." *Id.* at 1013-14. When asked why some billings covered an entire year of patient supplies, Mr. Bamonte explained that "sometimes it took a long time to get all the necessary documents in order, such as the authorizations." *Id.* at 1014. Special Agent Angle also testified that Mr. Bamonte adopted a statement Gina made during the interview that ADB Medical Supplies' "files sustained mold due to water damage from the fire department" after two fires at a laundromat in the company's building. *Id.* at 1017. However, testimony from the local fire chief who was

"personally involved" in both incidents contradicted this statement, as the fire chief stated that there was no "fire or water damage to the adjacent businesses" in the building. *Id.* at 1044-45.

{¶ 40} Jacob Mulinix is a special agent at the Health Care Fraud Section of the Ohio Attorney General's Office who investigates Medicaid fraud allegations. *Id.* at 1081-82. His investigation of ADB Medical Supplies started when he received two EOMB forms indicating that recipients were not receiving supplies from the company. *Id.* at 1083. In the course of the investigation, Special Agent Mulinix received "51 additional EOMB forms," all of which he investigated by interviewing "the recipients, their families, their caretakers, whoever would have any kind of direct knowledge of what was being received in that home for that patient." *Id.* at 1084-85. When reviewing claims made by ADB Medical Supplies, he also noticed "that there was an influx of claims in March of 2013, and several of those claims went back at least a year, some of which went back almost two years." *Id.* at 1086. Special Agent Mulinix also testified that Mr. Bamonte "identified himself as the 100 percent owner of ADB Medical Supplies" during an interview. *Id.* In the weeks after Special Agent Mulinix interviewed Mr. Bamonte, ADB Medical Supplies "backed out or reversed several claims" made in the past for supplies. *Id.* at 1138. The company "went in there and returned the billing, put negative numbers on the billing. Basically, they were returning it." *Id.*

{¶ 41} According to Special Agent Mulinix, the amount of DME that ADB Medical Supplies' supplier, McKesson, shipped "was significantly less than the amount of supplies" billed to ODM. *Id.* at 1091. As an example, he pointed to the testimony of an ODM recipient's mother who "testified that he [recipient] didn't receive these supplies and didn't need them. The McKesson records don't match or support any of the billing prior to December of '14 for what ADB Medical Supplies billed. And the patient file, which included one doctor's order for this client, wasn't signed until December 16th of 2014. So none of the claims prior to that would have been valid." *Id.* at 1137. For some Medicaid recipients, "the McKesson records do not support any of the billing" done by ADB Medical Supplies on the recipient's behalf "because there are no McKesson records for [the] client." *Id.* at 1151; *see also id.* at 1153. Special Agent Mulinix also described a claim submitted by ADB Medical Supplies for a patient who had died prior to the service dates on the claim. *Id.* at 1195.

{¶ 42} When reviewing ADB Medical Supplies' bank records, Special Agent Mulinix noticed several "larger-than-average transactions" that occurred over a four-week period in 2013. *Id.* at 1202-03. This "large billing influx" was comprised of a group of Medicaid recipients on whose behalf ADB Medical Supplies "only billed once, never before, never after." *Id.* at 1196. A journal of payment provided by ODM's Office of Budget Management showed that the department paid ADB Medical Supplies $21,096 on March 14, 2013, $69,722 on March 21, 2013, $37,712 on March 28, 2013, $11,165 on April 4, 2013, and $14,549 on April 11, 2013. (State's Ex. 14 at 10.) In this four-week period, the company exceeded the total amount billed for the entire previous year. *Compare id. at* 10 *with id.* at 8-10 (showing ODM payments to ADB Medical Supplies from March 15, 2012 to March 7, 2013 amounting to less than $110,000).

{¶ 43} During the same period, Special Agent Mulinix also noticed that Mr. Bamonte made a series of "larger-than-usual withdrawals" from his company's bank accounts. (Tr. at 1213.) On March 21, 2013, the same day that ADB Medical Supplies received its largest-ever payment from ODM of $69,722, Mr. Bamonte withdrew $59,704. *Id.* at 1216-17. (*See also* State's Ex. 15 at 401.) On March 28, 2013, the date that the company received $37,712 from ODM, Mr. Bamonte withdrew $16,846 from the company's account. (State's Ex. 15 at 402.) At the same time, cashier's checks were made out to Bamonte family members, as well as checks to several of the home health agencies from which ADB Medical Supplies had obtained recipient information. (Tr. at 1322-32.) Special Agent Mulinix testified that he calculated the "total loss" to ODM for improper Medicaid billing by ADB Medical Supplies between March 14, 2011 and January 1, 2015 was $79,139.11. *Id.* at 1237. (*See also* State's Ex. 34c (listing and totaling loss amounts to individual witnesses and home health agencies).)

{¶ 44} The defense's sole witness was Mr. Bamonte himself. (Tr. at 1371.) He testified that his sister Gina and employees of Cincinnati Home Care, Quality Care, and Comfort and Care were responsible for determining how much ADB Medical Supplies billed ODM as well as the amount his company was reimbursed. *Id.* at 1378, 1385-86, 1397-98. Bamonte stated that Gina and his brother Dan negotiated the Medicaid billing and reimbursement with representatives of Total Homecare Solutions. *Id.* at 1388-89. He also testified that ADB Medical Supplies' employee D.W. "did all of our Medicaid billing." *Id.* at

1380. Mr. Bamonte believed Gina and the home health care agencies had verified that all medical supplies ordered on behalf of patients "were allowed" by their doctors' orders. *Id.* at 1399. In addition, Mr. Bamonte claimed that he had reviewed a doctor's plan of care for each Medicaid recipient that had testified, that each plan of care authorized the billing of DME, and that the recipient's home health care agency had represented to ADB Medical Supplies that it had provided DME to that recipient. *Id.* at 1414-30.

{¶ 45} When asked about his company's relationship with International Quality Healthcare, Mr. Bamonte stated that ADB Medical Supplies had done "some consulting" for the company to assist with its transition to managed care billing, but "they didn't pay us. And so, that was kind of our first inkling that maybe they weren't on the level." *Id.* at 1405.

{¶ 46} Mr. Bamonte testified that the first time he was aware that recipients had not actually received DME billed to Medicaid by ADB Medical Supplies was "when Special Agent Mulinix came and met with us and said there were 60 people that said they didn't receive stuff." *Id.* at 1422. Mr. Bamonte claimed that in the month that Special Agent Mulinix had highlighted with the largest discrepancy between the amount billed to Medicaid by ADB Medical Supplies and the amount billed to McKesson for DME, he had a spreadsheet and paperwork showing that his company had bought DME from other suppliers. *Id.* at 1443. On cross-examination, Mr. Bamonte claimed that he had provided the state with receipts from DME suppliers in "supplemental discovery." *Id.* at 1493-94. However, the defense did not introduce any exhibit to support these assertions. *See id.* at 1362, 1391 (listing single defense exhibit of an email between employees of Total Homecare Solutions). Mr. Bamonte testified that as a result of a "self-audit," his company returned $60,000 to ODM in order to comply with a safe harbor rule for correcting billing discrepancies. *Id.* at 1454-55.

{¶ 47} On cross-examination, Mr. Bamonte was asked why ADB Medical Supplies waited two years to bill Medicaid for DME for patients of Cincinnati Home Care, Quality Care, and Comfort and Care. *Id.* at 1471. He replied that he "[didn't] know" because other company employees did the billing, and that his "guess [was] they were gathering information." *Id.* While admitting that "we probably could have done a lot better" with record keeping, he insisted that has company only billed for DME that was actually supplied

to Medicaid recipients.  *Id.* at 1494.  However, Mr. Bamonte acknowledged that when first contacted about the ODM investigation, "Agent Mulinix told us that 60 people in the last six months said they hadn't gotten supplies in some capacity or another."  *Id.* at 1495.

{¶ 48} After the jury returned guilty verdicts on both counts, the trial court sentenced Mr. Bamonte to three years of community control.  (Nov. 25, 2019 Jgmt. Entry.) In addition, the trial court imposed financial sanctions of $100,491.87, consisting of $57,555.83 in restitution to ODM and $42,936.04 in investigative costs.  *Id.* at 2.

{¶ 49} Mr. Bamonte appealed, asserting the following assignment of error:

> THE TRIAL COURT ERRED AND DEPRIVED APPELLANT
> OF DUE PROCESS OF LAW AS GUARANTEED BY THE
> FOURTEENTH AMENDMENT TO THE UNITED STATES
> CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE
> OHIO CONSTITUTION BY FINDING HIM GUILTY OF
> GRAND THEFT AND MEDICAID FRAUD, AS THOSE
> VERDICTS WERE NO SUPPORTED BY SUFFICIENT
> EVIDENCE AND WERE ALSO AGAINST THE MANIFEST
> WEIGHT OF THE EVIDENCE.

## II.  Standard of Review

{¶ 50} Because "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different," they require two different legal standards. *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.  "The standard when testing the sufficiency of the evidence ' "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' "  *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, ¶ 15, quoting *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 70, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, *superseded by state constitutional amendment on other grounds as stated in State v. Smith*, 80 Ohio St.3d 89, 102 (1997), fn. 4.  Legal sufficiency is a question of law that asks whether the state's evidence passes a "test of adequacy." *Thompkins* at 386.  A conviction resulting from "legally insufficient evidence constitutes a denial of due process." *Id.*, citing *Tibbs v. Florida*, 457 U.S. 31, 45 (1982) ("the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt").  A reviewing court "will not disturb

a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶ 51} The manifest weight of the evidence standard of review requires the appellate court to consider the state's evidence as an additional, or "thirteenth juror." *Thompkins* at 387. "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks,* 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 168, citing *Thompkins* at 387. Reversal on manifest weight grounds is appropriate " 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

## III. Analysis

{¶ 52} We begin by examining whether the evidence introduced at Mr. Bamonte's trial was legally sufficient for any rational trier of fact to convict him of every element of two charged offenses beyond a reasonable doubt. *Beverly* at ¶ 15. Mr. Bamonte was charged with grand theft under R.C. 2913.02(A)(3) and Medicaid fraud under R.C. 2913.40(B). (Mar. 20, 2018 Indictment.)

{¶ 53} The Ohio Revised Code's relevant definition of theft is: "No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services * * * [b]y deception." R.C. 2913.02(A)(3). *See also State v. Frazier,* 10th Dist. No. 10AP-112, 2010-Ohio-4440, ¶ 28 ("To prove that appellant committed theft by deception, the State must show: (1) intent, (2) to deprive the owner, (3) of something of value--i.e., property or services, (4) without the owner's consent, and (5) by deception.").

{¶ 54} The statute also defines several elements of the offense. First, "[a] person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage

in conduct of that nature." R.C. 2901.22 (A). Second, "deception" is defined as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact." R.C. 2913.01(A). In addition, an "owner" is "any person, other than the actor, who is the owner of, who has possession or control of, or who has any license or interest in property or services" obtained by deception. R.C. 2913.01(D). Finally, theft is elevated to grand theft "[i]f the value of the property or services stolen is seven thousand five hundred dollars or more and is less than one hundred fifty thousand dollars, * * * a felony of the fourth degree." R.C. 2913.02(B)(2).

{¶ 55} The state presented legally sufficient evidence for a reasonable jury to find that Mr. Bamonte purposely deprived ODM of funds in excess of the $7,500.00 threshold for grand theft, and that he used deception to accomplish this purpose. A.O., the owner of International Quality Healthcare, testified that Mr. Bamonte contacted her directly with a proposal to assist with difficulty in billing managed care insurers, but their agreement also allowed ADB Medical Supplies to obtain her company's excess medical supplies and bill ODM for it. (Tr. at 444-54.) Through this agreement, Mr. Bamonte obtained her clients' information and billed ODM for supplies that the clients never received. *Id*. Employees for another home health agency, Cincinnati Home Care, as well as its owner, described a similar scheme, in which ADB Medical Supplies promised to obtain reimbursement for DME, obtained client information, and billed ODM for supplies the clients never received. *Id*. at 531–69, 798-805. N.A., the owner of Total Homecare Solutions, also testified that Mr. Bamonte's company reimbursed his company for medical supplies while billing ODM for them, and that ADB Medical Supplies billed ODM for unauthorized DME. *Id*. at 625-632. In each case, Mr. Bamonte himself or representatives of ADB Medical Supplies falsely represented that ODM would reimburse the home health care agency for medical supplies that should have been part of the agencies' cost of doing business.

{¶ 56} The state's evidence also demonstrated that Mr. Bamonte deceived ODM by filing claims on behalf of Medicaid recipients who never received the medical supplies billed for or had no knowledge that his company had billed for supplies on their behalf. Nine

different Medicaid recipients testified at trial that they had never ordered DME or had knowledge of Mr. Bamonte's company. *Id*. at 114-21, 132-60, 165-67, 178-84, 272-73, 314-16, 330-35, 352-56, 500-04. No witness initiated the claim for DME with ODM, as required. *See id*. at 409 (testimony of Mr. Sabol that ODM only reimburses for medically necessary DME and "[t]he patient and prescriber would have to initiate the process for the order"). Furthermore, invoice records for McKesson, the DME supply company used by ADB Medical Supplies, do not show that DME was ever ordered for some of the Medicaid recipients on whose behalf Mr. Bamonte's company submitted claims to ODM. (*Compare* State's Ex. 4 and State's Ex. 5 *with* State's Ex. 7; *see also* Tr. at 1091-1153 (testimony of Special Agent Mulinix describing discrepancies between McKesson invoices and DME claims to ODM submitted by ADB Medical Supplies).) This evidence was legally sufficient to prove that Mr. Bamonte and ADB Medical Supplies made false representations to ODM in order to obtain reimbursement for DME.

{¶ 57} Evidence also showed that Mr. Bamonte exerted control over the funds after deceiving their owner to obtain them. Bank records and ODM's payment journal, as introduced by the state and described by Special Agent Mulinix, showed that ODM, the owner of Medicaid funds, paid ADB Medical Supplies after being presented with the false DME claims. (State's Ex. 14.) Bank records also show that Mr. Bamonte personally withdrew large sums immediately upon receipt of the funds from ODM. (State's Ex. 15 at 401-02.) The state's evidence demonstrated that the total loss to ODM was over $79,000, far in excess of the $7,500 threshold required to prove grand theft under R.C. 2913.02(B)(2). The foregoing evidence was legally sufficient to prove that Mr. Bamonte purposely submitted false claims to ODM to obtain funds for reimbursement of DME and medical supplies, that he deceived both the home health care agencies in order to acquire the information to submit those claims and ODM by their submission, and that the amount of funds he obtained elevated the theft to grand theft.

{¶ 58} The foregoing evidence was also legally sufficient to prove its claim of Medicaid fraud against Mr. Bamonte. R.C. 2913.40(B) states that "[n]o person shall knowingly make or cause to be made a false or misleading statement or representation for use in obtaining reimbursement from the Medicaid program." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably

cause a certain result or will probably be of a certain nature." R.C. 2901.22 (B). For the reasons discussed, the evidence was legally sufficient to show that Mr. Bamonte knowingly made false or misleading statements regarding the reimbursability of DME and medical supplies to home health agencies in order to obtain the information necessary to submit false claims for reimbursement from ODM.

{¶ 59} With regard to the manifest weight of the evidence analysis, our review of the extensive evidence presented at trial, both in the form of testimony and the lengthy paper record, reveals no "conflicts in the evidence" or examples of non-credible witness testimony to justify reversal of the conviction. *Wilks* at ¶ 168. "Though appellate courts must sit as a 'thirteenth juror' when considering a manifest weight argument, it must also give great deference to the trier of fact's determination on the credibility of the witnesses." *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 31, citing *State v. Favor*, 10th Dist. No. 08AP-215, 2008-Ohio-5371, ¶ 10. Mr. Bamonte has highlighted no evidentiary inconsistencies in his briefing to support his manifest weight argument. Our independent review concludes that the mountain of evidence introduced by the state weighed heavily in favor of conviction on both counts.

{¶ 60} Mr. Bamonte's only argument in support of his assignment of error is that the state produced no evidence that he "personally submitted any claims or bills to ODM or any other provider, let alone claims or bills that were false or misleading." (Appellant's Brief at 3.)

{¶ 61} Under R.C. 2901.24(A), "[a]n officer, agent, or employee of an organization * * * may be prosecuted for an offense committed by such organization, if he acts with the kind of culpability required for the commission of the offense, and * * * [i]n the name of the organization or in its behalf, he engages in conduct constituting the offense, or causes another to engage in such conduct, or tolerates such conduct when it is of a type for which he has direct responsibility." Mr. Bamonte's own statement to Special Agent Mounts was that he was the "100 percent" owner of ADB Medical Supplies and "basically ran the company." (Tr. at 958-59.) His company's employees testified that they were told what to bill ODM by Mr. Bamonte or Gina, his sister, that billing never occurred without employees being told what to bill, and that Mr. Bamonte was "in charge." *Id*. at 888-89, 911. This evidence was not legally insufficient simply because Mr. Bamonte himself was not the

"actual submitter of any claims to ODM," as he argues. (Appellant's Brief at 5.) It is legally irrelevant that Mr. Bamonte himself never pressed the enter key or clicked a mouse when submitting claims to ODM. The state's evidence was legally sufficient to show that he caused his employees to engage in the prohibited conduct under R.C. 2901.24(A) and weighed in favor of the jury reaching the same conclusion. He may not hide behind his employees or the corporate form to escape liability for his actions. *See Courtney Harvey Ford-Mercury v. Ohio Motor Vehicle Dealers Bd.*, 7th Dist. No. 97 CA 42, 1999 Ohio App. LEXIS 352, *9 (Feb. 4, 1999) (stating that legislative history shows that "the purpose behind [R.C. 2901.24] was to eliminate the possibility of individuals or corporations using a corporate structure as a shield from liability in criminal cases").

**{¶ 62}** For the foregoing reasons, we conclude that the state's evidence was legally sufficient to convict Mr. Bamonte for both offenses, and the convictions were supported by the manifest weight of the evidence. His sole assignment of error is overruled.

**{¶ 63}** Finally, we turn to the two issues on which we requested supplemental briefing from the parties:

> Whether the trial court committed plain error by failing to conduct the analysis under R.C. 2941.25 required by *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, and merge appellant's convictions for grand theft under R.C. 2913.02(A)(3) and Medicaid fraud under R.C. 2913.40(B)?
>
> Whether the appellant's conviction for Medicaid fraud under R.C. 2913.40(B) for a "continuing course of criminal conduct," as alleged in the March 20, 2018 Indictment and the May 10, 2018 Bill of Particulars, was authorized by R.C. 2913.61 under the holding of *State v. McGhee*, 10th Dist. No. 07AP-216, 2007-Ohio-6537?

(Jan. 25, 2022 Journal Entry.)

**{¶ 64}** With regard to the second issue, we conclude that *McGhee* did not prevent the state from indicting Mr. Bamonte for Medicaid fraud based on a continuing course of criminal conduct. In *McGhee*, we stated that by enacting R.C. 2913.61(C), "the General Assembly has authorized [the state] to prosecute particular series of offenses as a single offense, and, when the series is prosecuted as a single offense, has obviated the requirement that appellant prove each offense in the series." *McGhee* at ¶ 16. Because Medicaid fraud under R.C. 2913.40 was not one of the offenses enumerated in the statute, *McGhee* held

that "R.C. 2913.61(C) provides no authority for a series of Medicaid fraud offenses to be tried as a single offense." *Id.* at ¶ 17. However, the Ohio General Assembly subsequently amended R.C. 2913.61(C) to include the offense of Medicaid fraud under R.C. 2913.40. *See* 2011 Am.Sub.H.B. No. 86, Section 2913.61(C). Thus, our holding in *McGhee* has been abrogated, and the state's indictment of Mr. Bamonte was permitted under R.C. 2913.61.

{¶ 65} Turning to the merger issue, we begin with the premise that the prohibition against "multiple punishments for the same offense" is among the Double Jeopardy protections guaranteed under the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution. *State v. Pendleton*, 163 Ohio St.3d 114, 2020-Ohio-6833, ¶ 8. The Ohio Legislature enacted R.C. 2941.25 to codify this protection. *Id.* at ¶ 9. The statute states:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 66} "Because the prosecution selects the charges that may be brought based upon the criminal conduct of an accused and that conduct may potentially support convictions of multiple offenses, the judge must determine whether the conduct can be construed to constitute a single or more than one offense." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 13. In this case, the trial court did not conduct the R.C. 2941.25 analysis required by *Ruff* of Mr. Bamonte's convictions. The state concedes this point. (Supp. Brief at 4.)

{¶ 67} In the syllabus of *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, the Supreme Court of Ohio set forth the procedural remedy for such error:[1]

---

[1] At least one commercial legal database incorrectly warns that *Whitfield* has been "superseded by statute," citing its mention in *United States v. Mackey*, S.D. Ohio No. 3:04cr00096, 2014 U.S. Dist. LEXIS 163039, *6 (Nov. 20, 2014). Addressing a string of cases cited by a defendant challenging his state convictions that included *Whitfield*, the *Mackey* ruling incorrectly asserts that each case was superseded by R.C. 2929.191, "as indicated" by the Supreme Court of Ohio in *State v. Singleton*, 124 Ohio St.3d 173, 2009-Ohio-6434. *Mackey,* *6 at fn.4. However, R.C. 2929.191 addresses errors in judgments imposing post-release

1. The state retains the right to elect which allied offense to pursue on sentencing on a remand to the trial court after appeal.

2. Upon finding reversible error in the imposition of multiple punishments for allied offenses, a court of appeals must reverse the judgment of conviction and remand for a new sentencing hearing at which the state must elect which allied offense it will pursue against the defendant.

3. Because R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing.

**{¶ 68}** The state argues that even though the trial court failed to merge Mr. Bamonte's convictions, it "effectively merged the charges by sentencing [him] to concurrent prison sentences (should he violate community control)." (Supp. Brief at 4.) The state points to the sentencing hearing, during which the trial court advised Mr. Bamonte that if he violated the community control requirements, it would impose two concurrent 18-month sentences. *Id.*

**{¶ 69}** However, because "a court speaks through its judgment entries," we must "look to the judgment entry when determining the sentence imposed by the trial court." *State v. Berry*, 10th Dist. No. 97AP-964, 1999 Ohio App. LEXIS 2983, *56 (June 29, 1999) (citations omitted). *See also State v. Hairston*, 10th Dist. No. 07AP-160, 2007-Ohio-5928, ¶ 57 ("acknowledging a difference between the sentences that the trial court announced at the sentencing hearing and the sentences that the trial court stated in its judgment entries," but only considering the latter). Here, the judgment entry does not mention two prison terms served concurrently. The judgment entry states: "The Court hereby imposes a period of Community Control for THREE (3) YEARS." (Nov. 25, 2019 Jgmt. Entry.) The entry also warns that "if the Defendant violates Community Control, he will receive a prison term of 18 months," but fails to say whether this term pertains to one count or the other. *Id.* at 2.

---

control, which was not at issue in *Whitfield*. Nor did *Singleton* cite or discuss *Whitfield*. The Supreme Court of Ohio continues to cite *Whitfield*, including its syllabus law, without signaling any reservations concerning its status as precedent. *See State v. McFarland,* 162 Ohio St.3d 36, 2020-Ohio-3343, ¶ 25; *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 153.

{¶ 70} Furthermore, construing the judgment entry as imposing concurrent sentences would not remedy the error. According to the Supreme Court of Ohio, "even when the sentences are to be served concurrently, a defendant is prejudiced by having more convictions than are authorized by law." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, ¶ 31. As long as two convictions stand for the same conduct, "the court has imposed greater punishment than the legislature authorized." *State ex rel. Romine v. McIntosh*, 162 Ohio St.3d 501, 2020-Ohio-6826, ¶ 16, citing *Underwood*. The "imposition of multiple sentences for allied offenses of similar import is plain error." *Underwood* at ¶ 31, citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, *superseded by statute on other grounds*, *State v. Froman*, 162 Ohio St.3d 435, 2020-Ohio-4523, ¶ 39. For these reasons, the trial court committed plain error by failing to analyze Mr. Bamonte's convictions under R.C. 2941.25.

{¶ 71} We overrule Mr. Bamonte's assignment of error and affirm the findings of guilt, but we "reverse the judgment of conviction and remand for a new sentencing hearing" so that the state may exercise its "right to elect which allied offense to pursue" at resentencing. *Whitfield* at paragraphs one and two of the syllabus. *See State v. Hunt*, 10th Dist. No. 10AP-618, 2011-Ohio-4054, ¶ 29 (affirming two robbery convictions because the state's evidence was legally sufficient and of manifest weight to support them, but remanding under *Whitfield* because the convictions "arose out of a single criminal act, and * * * the trial court's failure to merge the two robbery convictions at sentencing constitutes plain error").

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

KLATT and DORRIAN, JJ., concur.

_____